and Roger Brooks. May it please the court. I am Roger Brooks, counsel for the appellant Brian Tingley. The briefing is obviously extensive, but I think the top of mind question has to be whether pickup is binding on this panel, or is the holding and the analysis of the Supreme Court and then it's Nifla decision in 2018. Clearly irreconcilable to quote Miller versus gammy standard, such that it should be considered overruled. The answer is it is clearly irreconcilable and my primary goal today is to walk through that with some care. But before I jump into the law I'd like to pause to be clear what really we're talking about. And for that I invite the thought experiment of a videotape of one of Mr Tingley's counseling sessions, of course we can't do that because it's confidential but it's alleged it's sworn, it's undisputed what we would see on that tape. What we would see is no self inflicted pain, no coercion or compulsive any sort. We would see nothing but listening, asking, and talking speech is all we would see. And indeed the state's expert Dr Roski and we quote him on page 55 of our brief. He's publicly acknowledged that therapists haven't been doing electroshock therapy and adverse and practices in decades. That's true. Those practices are not what this law is really about. And they're certainly not what this case is about. Council in pickup. One of the things we said is a doctor may not counsel a patient to rely on quack medicine is is that portion of pickup clearly irreconcilable with NIFLA. Your Honor, to the extent the state presumes to step into disputed areas of medicine. The answer is yes, let me jump to the law if I may nitpick because the premise of that holding and pickup is the professional speech is less protected, because as between ordinary citizens, people can and do offer all sorts of opinions which may or may not be in accordance with any consensus. So the foundation of pickup is the holding that professional speech is less protected. This court is aware from the briefing you're probably aware anyway that three different panels from three different circuits in various languages have said that pickup that NIFLA either abrogated or overruled or didn't adopt the core principles of pickup. Going back to my question, if, for example, the state medical board wanted to say to doctors, we believe this particular drug for this particular ailment runs a high risk of killing someone, they can forbid the doctor from prescribing the drug right. Well, Your Honor, they can prohibit the doctor from prescribing a drug. However, can they prohibit the doctor from recommending the drug? I think the answer from this court is no. In the marijuana case, exactly. But is the marijuana case the same as the licensing board determining that this is likely to kill patients? Because there's no question the doctor can be sued by the patient for recommending a drug that's below the standard of care. The recommendation is likely to kill him, right? Well, Your Honor, I think the malpractice example is one that we should pause on for a moment because NIFLA touches on that actually. And there's a very large difference between what can be done through malpractice and after the fact remedy and what the state can do in censoring speech. Because what happens in this law, of course, is the state kicks open the door of a private counseling room and says, what are you talking about? What goals are you pursuing? What did you say about it? That's very different from a malpractice action. Malpractice, the NIFLA court said. Although Justice Thomas wrote in referencing the joint opinion in Casey, the joint opinion explained that the law regulated speech only as a part of the practice of medicine subject to reasonable licensing and regulation by the state. And Justice Thomas did not, writing for the court, say and that's out, right? Well, Your Honor, the Casey case is quite different for at least two reasons. What NIFLA tells us is that if a restriction is content and viewpoint based, it's going to have to survive strict scrutiny. Casey was a disclosure case associated with a physical medical procedure. But what Justice Thomas for the court cited it for was speech as only a part of the practice of medicine. And where I'm having trouble with your argument, counsel, is that I don't see that portion of pickup absolutely abrogated by NIFLA and our standards for a panel ruling that a case is abrogated. I mean, some other circuit, they don't have any restrictions on what they can say about whether a Ninth Circuit case is abrogated, but we do. And I think you have a big mountain to climb. You might be able to convince it in bank court. You might be able to convince the Supreme Court. But we have a very tough standard for determining as a three judge panel that a prior decision that's on all fours is abrogated. Well, I'd like to try to climb that mountain with this panel, Your Honor, if I may. And you are not, of course, the first that's being asked to do this. And the Ninth Circuit in the Pacific Coast horseshoeing case, as you know, referred to NIFLA as having abrogated pickup. In an unpublished decision? It's a published decision. Okay. It's cited in the briefs, but it's also 961 F3rd at 1068. Abrogated for this proposition that we're dealing with here? So that's, of course, the core question, Your Honor. So let me just jump into that. What the state says is that there were two completely different legs of pickup or discussions. One was that professional speech is less protected. And the other was that this speech, and we've seen the videotapes, so to speak, that all that speech and nothing but speech can be called pure conduct. And the state argues that the discussion about professional speech was just dicta. And so that all that NIFLA overruled when it called out pickup in a list of disfavored cases that they were disagreeing with, all they were disagreeing with is that the proposition of professional speech is less protected. Now, you don't overrule, you don't abrogate dicta, so the circuits don't agree, but let's look closely. What is the logic of pickup? And, Your Honor, I submit that the step one of the logic of the pickup decision is, and I refer to page 1054 of that decision, they articulated a continuum of protection, quote, within the confines of the professional relationship. And that's critical. They did not hold, they didn't dare to suggest that the state could label a conversation between two citizens, between a parent and a child, between colleagues, that the state could label those conversations as conduct and thus gain the power to claim them. On the contrary, the foundational step of the whole pickup analysis is the court's assertion, again, 1054, that, quote, first amendment protection of professional speech is somewhat less protected. And it's only in that supposedly less protected context that the court felt able to indulge in the legal fiction that what we've seen on the tape as pure speech to be called pure conduct. It's only in that context of professional speech that the court felt able to dismiss out of hand, as they did in pickup, the indisputably content and viewpoint based nature of California's, in that case, censorship of these counseling conversations. And NIFLA cut the legs right out, removed that foundation stone. The proposition that professional speech is and should be recognized as a distinct category that is less protected, it's on this downward continuum of protection. I'm going to say in pickup, I apologize, I don't have the pin site right now, when a drug is banned, for example, a doctor who treats patients with that drug does not have a first amendment right to speak the words necessary to provide or administer the banned drug. Is that abrogated by NIFLA? Your Honor, I think that probably falls within the speech incident to conduct category. But here, this is like the Holder versus humanitarian law case where they specifically rejected the proposition that speech itself could be the conduct to which speech is incident. Well, see, this is where I have my fundamental problem with your argument. Because if that portion isn't abrogated, I don't see it as clear as you do that what's here can't arguably be within the phrase that I just read. Again, you might succeed in bank or with the Supreme Court, but our test is clearly irreconcilable. And I'm having a lot of trouble getting there. Well, Your Honor, what the state can't identify is any case, medical or otherwise, in which the speech incident to conduct exception is invoked, is permitted, when there is no conduct except speech. There's literally no such case. The Casey case, which has to do with compelled disclosures, the Casey court was very clear that they were dealing with a physical medical procedure as your hypothetical does as well with an injection with a prescription. There's a physical treatment case who's dealing with an abortion, a physical procedure, which the Supreme Court and NIFLA took pains to emphasize is so physical that they said if you do it without permission, it would be an assault. Does your client's license give your client the right to prescribe drugs? I think not, Your Honor. He is not a medical doctor. He's not a practicing doctor. So your client's regulated treatment is essentially speech. Well, Your Honor, my client is a licensed counselor. And among the list of professions that the Supreme Court and NIFLA, as Your Honor knows, they have a solid page of small print emphasizing the importance of what they refer to as the marketplace of ideas in the practice of medicine. And they list as the examples of where this is so important, the professions of doctor, nurse, and counselor. They give the example of a marriage counselor. Well, marriage counselors advise with regard to marriage, but my and my client does that as well. But because your counsel's practice is primarily speech, your view is primarily talking. Your view is that viewing that as conduct and regular and judging it as conduct rather than speech, a violates the First Amendment. And to the extent that pickup says that it's clearly abrogated. That's correct, Your Honor. And this is other than this recent wave of these types of censorship statutes that were issued pickup undeniably and pickup was included in this list of, what shall I say, disfavored laws in NIFLA. The city, the state cites the NAAP, the National Association for the Advancement of Psychiatry. Well, that and the other similar cases that they cite have no, represent no state effort whatsoever to tell any professional what they can say. Instead, those cases have to do exclusively with educational and certification requirements to present yourself and to practice as a psychologist or in one of the cases, a commercial interior designer. But once you're in, so to speak, once you're authorized to practice, they represent no effort whatsoever to censor speech. And the Supreme Court's NIFLA's emphasis on the importance of the marketplace of ideas within what is clearly within the medical professions. And again, my client is not a doctor, but it's analogous, I think, jumps off the page. They frankly go to a remarkable extent when they analogize efforts to do so as something that's like the Pol Pot regime or the Nazis. It's a striking passage. The state also says, and kind of flowing into the analogy you're drawing to medical practice, that all this does is regulate a particular treatment. Your Honor, I have to say that that's not correct. And the point is this, the statute, neither the statute nor the state in its briefs, identify any particular treatment. The only questions this law cares about are two. Who are you? Are you licensed? And what goal is this conversation headed towards? And that, Your Honor, is not identifying a particular treatment. That's prohibiting a particular conversation directed towards a particular goal. That is censorship of disfavored ideas. It is censorship of speech. And as to the question of do I believe that is strongly and absolutely protected by the First Amendment? The answer is yes. And do I believe that this type of law is unprecedented in the recent years that these have gone into effect? The answer is yes. Psychology and psychoanalysts have disagreed almost violently in every decade since Sigmund Freud. But the state has not stepped in and tried to arbitrate those disputes and dictate what theories of human nature, what theories of the possibility of change, what theories of the origin of various things in our personalities are correct or might be harmful. And I think there's little doubt that over the years, various theories have been wrong, have probably been harmful. But the First Amendment tells us again and again that the fact that a idea may be harmful, may cause harm, is not a sufficient basis to censor. And I want to jump to that. I do want to reserve five minutes, and therefore I have very little left for rebuttal. But, Your Honor, preventing harm from ideas is not merely not a compelling state interest. It's not a cognizable state interest. Counsel? Yes, Your Honor. May I interject a question? Has the U.S. Supreme Court said anything about conversion therapy? Your Honor, all they have done is cite the pickup case. And it's what I have described as foundational premise that professional speech is less protected. And they included that in a list that includes the New Jersey, the Third Circuit King case. And they said, no, we reject that premise. We have not recognized and certainly now is not the time to recognize professional speech as less protected. And instead, they swing and talk with great vigor about the importance of protecting speech by professionals within their professional capacity. I think that's the interview, but they've never referred to that phrase. They've never discussed that more explicitly than that. Thank you. My point about harm from ideas. I think everybody agrees that bad ideas can cause harm, but that's baked into our First Amendment jurisprudence, Your Honor, that we don't allow. We're talking about conversion therapy for minors here. Yes, Your Honor. Which the Supreme Court has recognized as particularly susceptible to certain kinds of things. It's not just the marketplace of ideas we're talking about. We're talking about a particularly venerable group. Well, a factual premise and then to the law, Your Honor, as it relates to minors. My client, again, does not. He only works with minors who want to work with him. And he works with minors whose parents want them to work with him. So we have both parental consent and the individual. There is no general power to censor communications to minors because we think they're bad ideas. And I refer, Your Honor, to our briefs at page 53 to 54. The Brown versus Entertainment Merchants case. No free floating power to restrict the ideas to which children may be exposed. Here is Nozick versus City of Jacksonville. In most circumstances, the value protected by the First Amendment are no less applicable when the government seeks to control the flow of information to minors. Now, the state cites cases that have to do exclusively with obscenity and indecent material to minors, which has always been considered in our jurisprudence as sui generis, for better or worse. But more to the point, each of those cases, Your Honor, actually turn not on the state's power to protect minors, but on the state's power to enable and facilitate parents to make these decisions. And I refer you to the FCC versus Pacifica Foundation case and the Ginsburg case, both of which justify those laws as necessary to enable parents to make decisions about what their children can hear. So those laws actually cut against this law as well, which not only cuts off what the young person, often a fairly mature minor, wants to hear, and cuts off the parental rights to control what their parents hear. And say you may not have this conversation because the state disagrees with your goal. And the state considers your religious convictions in many cases as just not worth weighing on the scale. And Your Honor, in the interest of time, I just I will say my last two and a half minutes. Thank you, counsel. Morning, Your Honors, and may it please the court. Christina Sepe, Assistant Attorney General on behalf of the state defendants at Belize. I'm also joined this morning by counsel for the intervener defendant, Equal Rights Washington, but will be arguing on behalf of the defendants. The Washington State Legislature enacted Senate Bill 5722 to protect children and youth from conversion therapy performed by licensed health professionals. Because efforts to change sexual orientation and gender identity are ineffective and puts minors at significant risk of harm, including elevated risks of suicidality, depression and anxiety. The district court correctly dismissed Mr. Tingley's challenge to this regulation of professional conduct, which this court can affirm for two reasons. First, Mr. Tingley lacks standing on behalf of himself and his third party minor clients and his claims are not right. Second, all of his claims are foreclosed by controlling circuit precedent, which analyzed a materially identical statute in pickup versus Brown and Welch versus Brown. I want to turn first to jurisdiction before reaching the free speech arguments that appellant's counsel has raised. And that's that Mr. Tingley lacks standing and his claims aren't right in this pre enforcement challenge. When we look at the factors that this court identified in its en banc decision in Thomas. First here, Mr. Tingley alleges that he asserts only someday intentions to violate Senate Bill 5722, not any concrete plan to violate it. When you look at his allegations in concrete by like naming patients and dates. Well, it doesn't have to go that extreme, Your Honor, but there are certainly the when, to whom, where or under what circumstances type allegations that. He certainly has a word that he is engaged in speech or I'm sorry, that is engaged in practices or speech, however you define it, that are forbidden by the ordinance, the statute. Right. So he states that he seeks to support his current and future clients who seek his help with issues relating to gender identity. No, but hasn't he hasn't he said that he has done this in the past? Well, when you look at his allegations of past conduct, they're actually quite vague and he appears to studiously avoid actually saying that he has performed sexual orientation or gender identity change efforts. And for example, with one client, he talks about a client who asserts female gender identity but then says male gender identity with another client he refers to an older teen so it's unclear if that teen would be regulated under the statute. I mean because it's possible that that person is 18 or 19. That's correct, Your Honor. So, going to the other Thomas factors as well. Mr. Tingley hasn't identified any specific warning or threat that's been initiated by the Department of Health as to him, you mean other than the statute. Yes, correct. And does he have to put his whole professional career at risk in order to challenge the statute. Well, no, no, Your Honor, what has to be shown though is that there is some sort of enforcement history that there is some credible threat of enforcement and that's just not present here as to his allegations. And again to judge the state is declaiming any intent to ever enforce the statute. No, Your Honor. Of course, are they declaiming any intent to enforce the statute against the plaintiff. No, Your Honor. So let's move on. Okay, thank you. The district court was also correct in deciding that Mr Tingley did not have third party standing with respect to his plaintiffs, and that is, I'm sorry, with respect to his third party minor clients. And that's because they are not hindered in their ability to protect their own interests and actual minor clients have brought claims to challenge sexual orientation change efforts restrictions. For example, in pickup, they filed pseudonymously as well as if we were to agree with you on that point but disagree with you on plaintiffs personal standing does that in any way affect our merits determination here. Well, that would push away the claims that he raises on behalf of his third party clients that is the free speech and free exercise claims. Okay, so let's focus on the central question here. What, what is your response that pickup is no longer good law after NIFA. I think it's the opposite, Your Honor, NIFA actually endorsed the central holding of pickup. And that's, do you rely on the distinction that NIFA involved compelled speech, whereas pickup involved regulation of treatment. And that is the line that NIFA had identified in terms of not touching regulations of conduct that states may pursue. And that is what the pickup court had held here that California's law restricting sexual orientation change efforts was a regulation of conduct, not speech. And here to would compel the conclusion that Senate Bill 5722 is a regulation of conduct and not speech. And that's because, as the court explained, it's a regulation of only treatment itself, whether that be physical medicine or mental health treatment. That's conduct. And the fact that speech may be used to carry out that kind of treatment doesn't turn it into a regulation of conduct. Well, counsel, what the court says is second under our precedent states may regulate professional conduct, even though that conduct incidentally involves speech. Are we free to, and you obviously don't quarrel with the fact that that's part of what the court said, right? Yes, no quarrel here. Are we free as a three-judge panel to look de novo at the issue of whether this statute incidentally involves speech or involves speech more than incidental? Or are we bound by pickups determination with regard to that? Because it hasn't been clearly, because it's not clearly irreconcilable with NIFLA. Can we look at it anew? Or do we have to basically for the moment, at least stick with pickup? This court remains bound by pickup, which had concluded that this was a regulation of conduct that may incidentally impact speech. And that holding would apply here as well. I want to speak a bit to Appellant's counsel's depiction of what the court had explained in pickup with respect to that continuum. The pickup court had talked about one end of the continuum where a doctor's First Amendment protections may be at its greatest. And that's when he is speaking in the public sphere. On the other hand of the continuum, the court identified where the state's power is great. And that's where they regulate conduct, professional conduct. Pickup then identified that midpoint of the continuum, professional speech, but it's holding didn't rely on it. And what NIFLA did do was criticize pickups recognition of that midpoint category that this court had discussed in pickup, as well as relied on in NIFLA. In pickup, we said it's not, we said that the statute there wasn't at the midpoint, right? Exactly, exactly. And that's why NIFLA is not clearly reconcilable with pickup and can be harmonized. Which it might be if pickup had relied on the speech being in this supposed, potentially now abrogated midpoint. Correct, which is what this court had done in its lower court decision in NIFLA. I want to go quickly to this idea that therapists can't engage in the marketplace of ideas, because it's very clear that this is purely a regulation of treatment for minors. And as the court in pickup recognized, it doesn't do anything to prevent licensed therapists from discussing, recommending for or against sexual orientation or gender identity change efforts. It doesn't prevent them from speaking in the public sphere about sexual orientation or gender identity change efforts. All it does is prohibit treatments that engage with the fixed outcome of trying to change sexual orientation or gender identity. Well, counsel, you know, part of what your friend is arguing, although I don't think in their oral argument today is void for vagueness. So you've said they're not forbidden from talking to their patients about this. How do you figure out under this regime that where the line is between seeking to change and just discussing? Where in the statute or case law is that line defined so that a person of common understanding wouldn't have to guess where the line is? Well, this court easily resolves that vagueness type challenge in pickup with respect to what change would look like. And here the statute is clear. Discipline attaches where a licensed health professional seeks to change that sexual orientation or gender identity. That is the externally chosen goal of changing sexual orientation or gender identity. It doesn't touch where, say, a minor client might not have a clear idea of what their gender identity is or wants to have a better understanding of why they're experiencing some distress related to their sexual orientation. The law wouldn't touch that. What it does do is if the stated goal and the intent of the treatment is to change sexual orientation and gender identity, then that is prohibited as practiced by licensed professionals. In that regard, as to what you say can be said to the minor by the therapist, is it the state's view that the Washington law in that regard is identical, materially identical to the California law in terms of where that line is? Yes, Your Honor. The only difference between Washington's law and California's law is that Washington's law is slightly more explicit in prohibiting change efforts with respect to gender identity. But California's law also reaches it by talking about prohibitions against changing gender expressions. As the pickup court explained with respect to the due process challenge, these are words in a statute that reasonable persons can understand, like gender identity, like sexual orientation, like change. But even if that weren't the case, the law regulates a specialized group of folks with particular knowledge. Those who are trained as licensed health professionals who would know what the statute is regulating, especially where they purport to practice sexual orientation or gender identity change efforts. Finally, just a few points on the free exercise clause, Your Honor, even though that was not addressed in the opening argument. Those claims are also foreclosed by this court's decision in Welch. Like in Welch, the challenge law is neutral and generally applicable and readily satisfies rational basis review. The legislature had considered the evidence of inefficacy as well as harms, the positions of all leading medical and mental health organizations that have repudiated conversion therapy, as well as the fact that being gay, lesbian or transgender is not a mental disorder. Just briefly on the third party claims, Your Honor, again, because Mr. Tingley lacks standing on behalf of his minor clients, he also cannot assert these claims, but for the reasons that they fail as to Mr. Tingley, they would also fail as to his minor clients. So if the panel has no further questions, we'll ask that the court affirm the district court's dismissal of Mr. Tingley's complaints and denial of his motion for preliminary injunction. Thank you. Thank you, Ms. Seve. Mr. Brooks. Your Honor's repeated references to or analogies to medical treatment, which is actually odd because nobody in this case is contending that a same sex attraction is a mental illness, but it may nevertheless be contrary to life goals, life choices, and indeed faith teachings of a particular individual. So what we're what we're censoring here is conversations that are not medical. It is a licensed practitioner, but it falls into the same category as marital counseling. There are things in life that people choose and goals they want to pursue. Concerning the facts, of course, any one of us is concerned about harm to minors, and my client is intensely concerned about harm to minors. They're highly disputed, and Your Honors have in Appendix 3, the expert reports of Dr. Levine and Dr. Rozic, which are detailed, extensively cited in scientific literature, I think very clearly laid out. This is controversial stuff. It is not motion to dismiss stuff. None of us want to hurt minors, but resolving those aspects of this, contrary to the plaintiff, is not something that should happen at the preliminary injunction stage. As to free exercise, the counsel essentially said, the state deems that a religion that teaches somebody to pursue a gender identity aligned with the biology that, in their point of view, God gave them is just not legitimate. It's harmful. You're not authorized to pursue that. But then the counsel said, and I understand the argument, certainly, that we're bound by Welch, so we don't need to get into the law and theology of that. The answer to that, Your Honors, is no, because Welch didn't do a hybrid scrutiny analysis, a strict scrutiny analysis. Welch didn't do that because it accepted the premise that there was no speech here. There was nothing but conduct. And so if Your Honors agree that NIFLA undermines the fundamental premise of pickup and says, no, that declining continuum of protection doesn't exist and doesn't authorize us to call this speech conduct, then the Welch claim, the free exercise claim, becomes unavoidably a hybrid rights claim. And I would just, because then there's speech entwined with exercise. And I would call Your Honors attention to the San Jose Christian Academy case from the Ninth Circuit, which says unambiguously that the hybrid rights theory or claim is respected in Ninth Circuit law. Your Honor, under either the speech claim or the free exercise claim, our argument leads, intellectually, to this being subject to strict scrutiny. And no court anywhere has suggested that such a clear censorship of what is, in fact, pure speech could pass strict scrutiny. Thank you, Your Honors. Thank you, Counsel. Tingley v. Ferguson will be submitted. We'll take up Kesak v. the Washington State Department of Corrections.
judges: WARDLAW, GOULD, BENNETT